**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SAMUEL ONWUKA ANAMEZE,**

                                        **Plaintiff,**

        **vs.**                                                    **1:24-CV-192**
                                                                   **(MAD/PJE)**

**UR M. JADDOU,** *in her official capacity as*
*Director of U.S. Citizenship and Immigration*
*Services,*

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**BLESS LITIGATION**                     **JESSE M. BLESS, ESQ.**
6 Vineyard Lane
Georgetown, Massachusetts 01833
Attorney for Plaintiff

**U.S. DEPARTMENT OF JUSTICE**           **TROY D. LIGGETT, ESQ.**
Office of Immigration Litigation
Enforcement Unit
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff Samuel Onwuka Anameze ("Plaintiff") initiated this action on February 7, 2024,

with the filing of a complaint against Defendant Ur M. Jaddou in her official capacity as Director

of U.S. Citizenship and Immigration Services ("Defendant" or "the Government"), for alleged

1

violations of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).  *See* Dkt. No. 1.[1]

Plaintiff's claims arise from the United States Citizenship and Immigration Services' ("USCIS")

denial of Plaintiff's petition to classify a Nigerian orphan as an immediate relative in order for

Plaintiff to adopt the orphan in the United States.  *See id.*

Presently before the Court is Plaintiff's motion for summary judgment.  *See* Dkt. No. 12.

Defendant responded in opposition.  *See* Dkt. No. 19.  Plaintiff replied.  *See* Dkt. No. 20.  For the

following reasons, Plaintiff's motion is denied.

## II. BACKGROUND

### A.    Statutory Framework

The Immigration and Naturalization Act ("INA") "provides that a citizen of the United

States may file an application on behalf of an orphaned child adopted abroad."  *Nwankwere v.*

*Jaddou*, No. 1:22-CV-01212, 2023 WL 5835785, *5 (E.D. Cal. Sept. 8, 2023) (citing 8 U.S.C. §§

1154(a)(1)(A)(i), 1101(b)(1)(F)(i)).  "'The application, known as the I-600 petition, requests that

the orphaned child be classified as an "immediate relative" and granted a visa to permanently

reside in the United States.'"  *Id.* (quoting *Skalka v. Kelly*, 246 F. Supp. 3d 147, 149 (D.D.C.

2017)); *see also* 8 U.S.C. § 1154(a)(1)(A)(i).  "The goal of the I-600 petition is to determine

whether the child meets the statutory definition of an 'orphan.'"  *Nwankwere*, 2023 WL 5835785,

at *5 (quoting *Skalka*, 246 F. Supp. 3d at 150).  The INA defines "child" as follows:

> [A] child, under the age of sixteen at the time a petition is filed in
> [sic] his behalf to accord a classification as an immediate relative
> under [8 U.S.C § 1151(b)], *who is an orphan because of the death*
> *or disappearance of, abandonment or desertion by*, or separation or
> loss from, both parents, or for whom the sole or surviving parent is
> incapable of providing the proper care and has in writing
> irrevocably released the child for emigration and adoption; who has

---

[1] As of January 20, 2025, Kika Scott is the Acting Deputy Director of USCIS.  *See* Leadership, USCIS, https://www.uscis.gov/about-us/organization/leadership.

> been adopted abroad by a United States citizen and spouse jointly,
> or by an unmarried United States citizen who is at least 25 years of
> age, at least 1 of whom personally saw and observed the child
> before or during the adoption proceedings[.]

8 U.S.C. § 1101(b)(1)(F)(i) (emphasis added).

The INA "sets forth the regulatory framework for an orphaned child adopted from Nigeria,

a country which is not a party to the Hague Convention, to be classified as an immediate relative

for immigration purposes.  The petitioner may submit the Form I-600 to USCIS along with

supporting documentation to demonstrate that the child meets the statutory definition of an

orphaned child." *Nwankwere*, 2023 WL 5835785, at *5 (citing 8 C.F.R. § 204.3(a)(1)(i)-(ii)).

"Such supporting documentation includes the 'orphan's birth certificate, or if such a certificate is

not available, an explanation together with proof of identity and age,' evidence that the child is an

orphan, and evidence of a full and final adoption abroad." *Id.* (quoting 8 C.F.R. § 204.3(d)(1)).

"'The non-existence or other unavailability of required evidence creates a presumption of

ineligibility.'" *Id.* (quoting 8 C.F.R. § 103.2(b)(2)(i)).  The district courts in *Skalka* and

*Nwankwere* explained the process for filing a I-600 petition as follows:

> The I-600 petition triggers a consular officer to conduct what is
> called an I-604 investigation into the veracity of the child being
> orphaned (i.e., verifying documentation, researching the child's age,
> hometown, etc.).  By regulation, a consular officer must complete
> this investigation "in every orphan case," and "[d]epending on the
> circumstances surrounding the case, the I-604 investigation shall
> include, but shall not necessarily be limited to, document checks,
> telephonic checks, interview(s) with the natural parent(s), and/or a
> field investigation."  8 C.F.R. § 204.3(k)(1).  The timing of such an
> investigation is not specified except that it must be completed
> "before a[n I-600] petition is adjudicated."  *Id.*
>
> If the consular officer conducts a favorable I-604 investigation, he
> may approve the I-600 petition and the adoptive parents may apply
> for and obtain a visa for the child.  If the officer determines the
> application is "not clearly approvable" based on his investigation,

he refers it to the USCIS office in the jurisdiction.  8 C.F.R. §
204.3(k)(2).

*Nwankwere*, 2023 WL 5835785, at *5 (quoting *Skalka*, 246 F. Supp. 3d at 150) (spacing added).

"The I-604 investigation form declares that if there are 'allegations or indications of fraud, child buying or other non–bona fide intent' the consular officer must 'attach report and results of anti-fraud investigation to Form [I]-604 when complete.'" *Id.*  "The USCIS office then reviews those findings and makes a [] determination on the I-600 petition after providing the parents with notice and an opportunity to present contrary evidence." *Id.* "An orphan petition must be accompanied by full documentation" including, among other things, "[e]vidence of adoption abroad or that the prospective adoptive parents have, or a person or entity working on their behalf has, custody of the orphan for emigration and adoption in accordance with the laws of the foreign-sending country." 8 U.S.C. § 204.3(d)(iv)(B).

"Abandonment by both parents means that the parents have willfully forsaken all parental rights, obligations, and claims to the child, as well as all control over and possession of the child, without intending to transfer, or without transferring, these rights to any specific person(s)." *Id.* § 204.3(b).  "A child who is placed temporarily in an orphanage shall not be considered as abandoned if the parents express an intention to retrieve the child, are contributing or attempting to contribute to the support of the child, or otherwise exhibit ongoing parental interest in the child. A child who has been given unconditionally to an orphanage shall be considered to be abandoned." *Id.*  "Disappearance of both parents means that both parents have unaccountably or inexplicably passed out of the child's life, their whereabouts are unknown, there is no reasonable hope of their reappearance, and there has been a reasonable effort to locate them as determined by a competent authority in accordance with the laws of the foreign-sending country." *Id.*

In its Policy Manual, USCIS has explained that primary evidence of abandonment "is a decree from a court or other competent authority [] unconditionally divesting the parent(s) of all parental rights over the child because of such abandonment, disappearance, desertion, loss, or separation.[]  A valid court order terminating parental rights over the objections of one or both parents is sufficient if the parents received notice and an opportunity to contest such action." USCIS Policy Manual, Volume 5, Part C, Chapter 7(B)(4) (Jan. 15, 2025), https://www.uscis.gov/policy-manual/volume-5-part-c-chapter-7.  "USCIS generally accepts a foreign decree or order on its face as primary evidence of a determination by a foreign court. Absent specific material information that a court decree is legally invalid or was obtained by fraud, an officer may generally rely on such authentic decrees as evidence of a determination by a foreign government."  USCIS Policy Manual Vol. 5, Part C, Ch. 8(B)(2).

"An officer may . . . question the validity of a decree or order for various reasons," including the following: "[l]ack of parental consent to the adoption; [n]o or improper notice of termination of parental rights; [e]vidence of corruption, fraud, or material misrepresentation; [l]ack of due process or appropriate safeguards in the country or jurisdiction issuing the order; or [o]ther credible and probative evidence to question the reliability of the documentation." *Id.*  "If there is reason to doubt the validity of the decree or order, the officer may request additional evidence."  *Id.*  "Fraud in the adoption context typically involves concealment of a material fact to obtain an official document or judgment by a court or authorized entity (for example, an adoption decree).  To meet the requirement of materiality, evidence of fraud must be documented and generally relate to the child's eligibility as an orphan."  USCIS Policy Manual Vol. 5, Part C, Ch. 6.  "The standard of proof for establishing eligibility for orphan petitions is that of a preponderance of the evidence.  The [prospective adoptive parent] meets this standard if

the evidence permits a reasonable person to conclude that the claim that the child is an orphan is

probably true." USCIS Policy Manual Vol. 5, Part C, Ch. 8(B) (footnotes omitted).

**B.      Factual Background**[2]

Plaintiff and his wife, Augustina Bekee Anameze, are United States Citizens. *See* Dkt.

No. 12-1 at 7. On February 10, 2019, they signed an adoption application. *See* Dkt. No. 19-1 at 1

(citing CAR at 140). The application was stamped as received, that same day, by the Ministry of

Social Welfare, Children and Women Affairs, Anambra State, Nigeria. *See id.* at 1-2 (citing CAR

at 140). Plaintiff and his wife were not in Nigeria on February 10, 2019. *See id.* at 1. The letter

Plaintiff provided with their application states that Plaintiff is 60 years old, and his wife is 52

years old. *See* CAR at 140. Mrs. Anameze was actually 51 years, six months, and thirty days old

at the time of the application. *See* CAR at 4. Plaintiff contends that he incorrectly listed his

wife's age, but the Government notes that the application "does not indicate who incorrectly listed

Mr. Anameze's spouse's age on the application." Dkt. No. 19-1 at 2. The letter is signed by

Plaintiff and his wife. *See id.* at 1.

On July 23, 2020, a police report was created which indicates that around 4:10 PM, Mrs.

Udokwu V.O.[3] "came to the [police] station with a sworn affidavit issued from High Court

---

[2] In moving for summary judgment, Plaintiff submitted a statement of material facts as required by Local Rule 56.1. *See* Dkt. No. 13. Defendant submitted a response to Plaintiff's statement of material facts as well as a statement of additional material facts as required by the Local Rule. *See* Dkt. No. 19-1. Because Defendant reiterates Plaintiff's statements before providing a response, the Court will cite to Defendant's filing when discussing the factual background of the case. The Court will also rely on the administrative record submitted by Defendant. *See* Dkt. No. 11, Certified Administrative Record ("CAR"). Citations to the certified administrative record are to the pagination in the center of the footer on each page generated by the agency.

[3] Plaintiff refers to Mrs. Udokwu as a "director," her affidavit is signed as "Officer Chairman," and the Government refers to her as a "matron" of the orphanage. Dkt. No. 19-1 at 2; CAR at 142. Her title has no impact on the analysis in this case.

Awka." CAR at 141. Mrs. Udowku swore an affidavit stating that she is the Matron of Idemili North Local Government Community Children's Home and "in the early hours of the day, a baby boy was found abandoned at the gate of the Orphanage Home." CAR at 141.[4] A security guard found I.D.A. *See id.* at 141-42. Mrs. Udokwu attested that "[t]here were no traces of where the baby had come from and no witnesses to the persons who had left the child there. Social inquiries are being conducted to find the parent or birth mother of the child." *Id.* at 142. The police report indicates "[t]hat a search was conducted to find the person(s) who might have left the child there, but all effort proved abortive. That the baby has estimated to be a day old, taken in and attended to by the staff of the Home and was ensured to be in a stable condition. That since the child's arrival[,] nobody has come to claim him." *Id.* at 141.

A Child Health Card was created for I.D.A. *See* CAR at 102-03. Defendant attests that "[t]he record does not include information on who created the Child Health Card." Dkt. No. 19-1 at 3. However, Plaintiff is correct that the Card is on a form from the "National Primary Health Care Development Agency." CAR at 102. The Ministry of Women Affairs and Social Development of the Government of Anambra State of Nigeria acknowledged receipt of the police report and affidavit and "request[ed] [the] Orphanage Home to keep custody and take care of the child at the orphanage, pending [] further investigation." CAR at 143.

On August 18, 2022, Plaintiff and his wife submitted a letter to USCIS titled, "Reason for [I.D.A.] being fostered by Udoka Sunday Okor Ngozi Bibian Okoro." CAR at 112, 129. The letter stated that after submitting their application to adopt a child in February 2019, and "[w]hen the ministry finally found a child to foster to us, we were not able to travel to Nigeria because of

---

[4] The Court will refer to the child as "I.D.A." which are the initials utilized by the parties. *See* Dkt. Nos. 12, 19, 20.

the COVID lockdown and the risk of traveling outside of the county." CAR at 112. Plaintiff "then decided to place [I.D.A.] in the care of our relatives, Udoka Sunday Okoro and his wife Ngozi Bibian Okoro, who is my wife's niece, to take care of him, until we were able to come to Nigeria." *Id.* Plaintiff explained that "[d]uring the period that our son was in their care, we maintained adequate contact with them through daily phone and video calls making sure our son was well taken care of. We provide all the finances for the welfare of our son." *Id.* The Government is correct in its response to Plaintiff's statement of material facts that Plaintiff's letter is silent as to who contacted Plaintiff to inform him about I.D.A. or when such contact occurred. *See* Dkt. No. 19-1 at 3.

On September 2, 2020, a Chief Magistrate of the Magistrate's Court of Anambra State of Nigeria entered an Order placing I.D.A. in the custody of Mr. and Mrs. Okoro. *See* CAR at 145. The Order was in response to an "application for the fostering/placement of [I.D.A.] filed by the probation officer Anazodo Nkechi (Mrs.) in respect of the above named suit and the affidavit in support of applicants Mr. Udoka Sunday Okoro & Mrs. Ngozi Bibian Okoro . . . ." *Id.* The Chief Magistrate considered "the application, the affidavit, the exhibits annexed and the depositions of the deponents in their entireties" and "oral testimonies of the parties concerned." *Id.* An Assistant Chief Registrar stamped, signed, and dated the application. *See id.*

On January 29, 2021, Mrs. Nkechi, with the title of Deputy Director of Child Development, issued an "Approval for adoption of a male child by" Plaintiff and his wife. CAR at 146. The form states that Mrs. Nkechi is "directed to refer [their] application . . . and to convey the Ministry's approval for [Plaintiff and his wife] to commence the adoption process by fostering a male child from the ministry." *Id.* The form explains that "[t]his approval is sequel to the outcome of the social inquiry conducted and the interviews we had with [Plaintiff and his wife].

Their bonding is expected to last for at least three consecutive months before the final adoptions process can take place." *Id.* On March 22, 2021, Mrs. Nkechi issued a "Statement of consent to the adoption of [I.D.A.] (abandoned child)." CAR at 147.

On March 30, 2021, the Chief Magistrate issued an Order placing I.D.A. in Plaintiff's custody "for fostering pending the adoption order for a period not exceeding six months." CAR at 148. The application was made by Mrs. Nkechi. *See id.* The Order is stamped, signed, and dated by an Assistant Chief Registrar. *See id.*

Plaintiff contends that, in March 2021, he traveled to Nigeria to attend a foster hearing before the Magistrate Court. *See* Dkt. No. 19-1 at 4. The Government denies this, stating that the record does not indicate Plaintiff traveled to Nigeria to attend a foster hearing. *See id.* Plaintiff cites to the Chief Magistrate's Order, but the Order does not indicate Plaintiff was in Nigeria at the time. *See* CAR at 148. A later Order from the Chief Magistrate indicates that Plaintiff's wife was in Nigeria for the hearing. *See* CAR at 152.

On September 22, 2021, Mrs. Nkechi issued a document titled "Birth certificate with the biological parents name not listed." CAR at 149. The document "is to confirm that birth certificate listing the above child's biological parents are not available. This is because the child was an abandoned child and all efforts done to trace his biological parents were not successful. He was abandoned under circumstances that did not endanger his safety." *Id.* "As such, there is no birth certificate listing the child's biological parents or mother on him because as stated, the biological parents of the child are unknown." *Id.* "The certificate of birth will instead be issued with the name of the adopting parents, [Plaintiff and his wife,] after the Adoption Order." *Id.*

Also on September 22, 2021, a Contemporary Home Study and Adoption Report was completed by a Senior Social Welfare Officer which recommended approving Plaintiff's adoption

request.  *See* Dkt. No. 19-1 at 5 (citing CAR at 150-51).  Plaintiff contends the report summarized I.D.A.'s discovery and process for adoption.  *See id.*  As Defendant states, the report does not summarize I.D.A.'s discovery.  *See id.*  Rather, the report explains only that Plaintiff and his wife "engaged caregivers to take care of the child for them while they had a direct daily control of the child's welfare" while they were absent from Nigeria.  CAR at 151.  The report notes that Plaintiff maintained adequate contact with I.D.A. and the Ministry, and that they are prepared to financially care for I.D.A.  *See id.*  The report further states that "[e]ven though they live in the United States of America, there was demonstrable love and wonderful relationships between them and [I.D.A.].  During their visits to Nigeria, there was continuous contact between the couple and the Ministry . . . .  The Ministry is convinced that the Applicants will take care of the child properly and look after him well."  *Id.*

On September 29, 2021, the Chief Magistrate granted Plaintiff and his wife's request to adopt I.D.A.  *See* Dkt. No. 19-1 at 5 (citing CAR at 152-54).  The Chief Magistrate excused their appearance at the proceeding because Plaintiff's wife "having physically presented herself as representing [Plaintiff] in this court on the 30th day of March, 2021 when the fostering order was made."  CAR at 152.  The waiver was "due to the COVID-19 pandemic travel restrictions."  *Id.*  The Order states that the Ministry "say that they have verified the applicants' data and conducted their investigations and that they do not oppose the applicants' application . . . ."  *Id.*  The Chief Magistrate's Order states that he "consider[ed] the application together with the affidavit in support and the exhibits annexed including the oral testimonies of the parties concerned."  CAR at 154.[5]

---

[5] Defendant denies this allegation, but the dispute is over the correct page number of the Order, and not the substance of the Order.  *See* Dkt. No. 19-1 at 5.

On October 6, 2021, Mrs. Nkechi issued a document titled, "Authority to travel out of Nigeria." CAR at 155. The document states that "[t]he child was an abandoned child," released from the Orphanage, and adopted by Plaintiff and his wife. *Id.* Therefore, "the adoptive parents . . . are free to travel out of Nigeria with the Child . . . as parents and Child." *Id.* Mrs. Nkechi also issued "Confirmation of Adoption" and "Adoption of Child" papers. *Id.* at 157-59. On October 10, 2021, the Federal Republic of Nigeria National Population Commission issued a Birth Certificate for I.D.A., listing Plaintiff and his wife as parents. *See* CAR at 139.

On July 5, 2022, Plaintiff filed a Form I-600 Petition to Classify Orphan as Immediate Relative with USCIS. *See* Dkt. No. 19-1 at 6 (citing CAR at 24-40). On July 19, 2022, USCIS issued a Request for Evidence. *Id.* (citing CAR at 123-25). USCIS specifically "requested the affidavit from the orphanage director submitted to the Magistrate Court on July 23, 2020." *Id.* (citing CAR at 124). USCIS also requested information as to why Plaintiff and his wife initially fostered I.D.A. *See id.* Plaintiff submitted (1) Mrs. Udokwu's affidavit from the day I.D.A. was found and (2) Plaintiff's letter explaining the COVID-19 pandemic's affect on travel and the decision to place I.D.A. into Mr. and Mrs. Okoro's care. *See* CAR at 128-29.

"USCIS sent the orphan petition to the United States Consulate in Lagos, Nigeria for a consular Form I-604 Determination on Child for Adoption, according to 8 C.F.R. § 204.3(k)." Dkt. No. 19-1 at 7 (citing CAR at 16-19, and 92). On January 25, 2023, the Consulate informed Plaintiff that it "has completed the required I-604 Determination on Child for Adoption, commonly called the orphan determination, for your case. The Consulate has determined that the beneficiary does meet the definition of an orphan under . . . INA § 101(b)(1)(F)." CAR at 97. However, on February 8, 2023, the Consulate informed Plaintiff it "determined that the beneficiary do [sic] not meet the definition of orphan . . . ." CAR at 96. The e-mail states,

"[p]lease disregard the previous email we sent you on Wednesday, January 25, 2023[,] regarding the approval of your beneficiary's I-604 determination." *Id.*

On July 18, 2023, USCIS issued a Notice of Intent to Deny the orphan petition. *See* Dkt. No. 19-1 at 7 (citing CAR at 70). The Notice stated that the Consulate "returned a Form I-604 in advance determination on January 17, 2023, finding the petition is not clearly approvable because there is no credible evidence to support your claim the child is an orphan as defined in INA 101(b)(1)(F)." CAR at 70. The Notice explains that the "Consulate noted your application letter to the Ministry and says [Plaintiff's wife] is 52 years old. The letter is stamp[ed] received by the Ministry the same date as the letter despite no evidence you were in Nigeria on this date. Moreover, on February 10, 2019, [Plaintiff's wife was] actually 51 years, 6 months & 30 days of age." CAR at 73. The Consulate also "found no credible supporting evidence was present that a search was made for the biological parents, and no credible supporting evidence was provided of the child's supposed abandonment." *Id.* This was because Mrs. Udokwu's affidavit and the police report which stated that no one came to claim I.D.A. and "all efforts proved abortive", and a third document stating that "social inquires are being conducted to find the parent or birth mother of the child" were all dated July 23, 2020. *Id.*

USCIS explained that the Consulate had two meetings with Mrs. Nkechi who signed many of the documents in Plaintiff's application and Mrs. Nkechi "told a consular officer [d]uring a December 5, 2019, meeting that Ministry officials will create letters at adoptive parents' requested [sic] without verifying the accuracy of what they put in the letters." *Id.* "The U.S. Consulate stated this evidence and the evidence of backdated documents undermine the probative value of the documents" Plaintiff submitted. *Id.* USCIS also noted that the Magistrate Court from which Plaintiff received his petition was a two-hour drive from the Ministry and "[t]here are numerous

12

Magistrate courts within a fifteen-minute drive of the Ministry, yet this case was held at a distant court." *Id.* Finally, the "Consulate found the circumstances . . . indicate[] a purposeful effort by a local court to circumvent the legal adoption process." *Id.* This is because "Section 156 of The Child Rights Law of Anambra State requires that a properly constituted Family Court sit as a Panel consisting of a Chief Magistrate and two assessors," but "[i]n this adoption order, no assessors were present, meaning the court was not properly constituted to hear an adoption case." *Id.* Therefore, USCIS "determined that [Plaintiff has] presented insufficient verifiable evidence about the origin of the child and no credible evidence to support the orphan definition of abandonment." *Id.* USCIS requested (1) a copy of I.D.A.'s birth certificate; and (2) "[e]vidence of orphanhood." CAR at 74-75.

    Plaintiff responded to the Notice. *See* CAR at 79-85. He submitted an "Affidavit of Facts" from Mrs. Nkechi dated June 8, 2020. *See* CAR at 99-100. In her affidavit, Mrs. Nkechi explained "[t]hat on December 5th, 2019, I received an uninformed visit from a Consular Office from the United Stated [sic] Immigration Services. That the persons from the United Stated [sic] Immigration Services requested for files of the children being adopted from the Ministry." CAR at 99. Mrs. Nkechi attested that she needed to be presented with an official application requesting documents, which the Consular Officer did not have. *See id.* She also explained "that, processed files are left in Court. That I meant that if files are kept in the Office from ten years ago, then the Office will be filled with files, and so processed files are left in the Court." *Id.* Mrs. Nkechi attested that she "did not say that documents are generated without reference to the files in the Court or without verifying the accuracy of what we put in the letters. That there are evidences [sic] and documentation regarding the origin of the children adopted by the Ministry, which are in the Court files." CAR at 100. She explained that "most of the birth parents of the children

adopted through the Ministry who were found abandoned could not be traced and thus designating them as wards of Anambra State Government, and children in need, thus making them eligible for adoption." *Id.*  Mrs. Nkechi stated "[t]hat all adoption processes were carried out in the best interest of the child involved.  That the Ministry creates the documents needed for immigration proceedings at the request of the adoptive parents, after an adoption order has been granted by the Court to the adoptive parents." *Id.*  Finally, she noted "[t]hat the documents created for immigration proceedings are prepared with regards and reference to the documentation records of the child kept in the processed file from the Court." *Id.*

Plaintiff submitted another document from the Ministry, signed by Mrs. Nkechi and dated August 15, 2023. *See* CAR at 105-09.  Mrs. Nkechi confirmed that the Ministry "carried out this adoption in accordance with the Anambra State Child's Rights Law, 2004." CAR at 105.  She explained that I.D.A.'s birth certificate submitted by Plaintiff is the only available birth certificate because I.D.A.'s biological parents are not known.  *See id.* at 106.  She stated that "[t]he child's parents have not been involved in the child's life since he was discovered, their whereabouts are unknown and there is no reasonable hope of their reappearance." CAR at 107.  Mrs. Nkechi noted that "competent authorities made efforts to find the birth parents or relatives of the child, such as the Police authorities and the social welfare of the Ministry, as evidenced by the social welfare Investigation Report and the Social welfare investigation report."[6] *Id.*  She also explained that Plaintiff and his wife were in Nigeria in January 2019, and they spoke with the Ministry about wanting to adopt a child, and they sent their February application into the Ministry through their relative, Mr. Okoro.  *See id.*

---

[6] The redundancy in this sentence is quoted as it appears in the original document.

As for the location of the Ministry compared to the Magistrate Court, Mrs. Nkechi stated that the Ministry has often used that court, which has maintained records of adoptions, "hence the continuity." *Id.* Additionally, "the magistrate court in Nnewi is not a local court, it is a Chief Magistrate Grade I and it has the powers and jurisdiction to sit and determine adoption cases." CAR at 108. She also noted that the city of Nnewi "is approximately a 35 minutes' drive from the Ministry in Awka and not a two-hour drive as stated in the USCIS letter." CAR at 107. Mrs. Nkechi stated that "the Ministry only in September, 2022 identified a family court in Awka for her adoption matters." CAR at 108. Mrs. Nkechi explained that "assessors are always present in the family court hearings including adoption matters." *Id.* She stated that the "assessors are Social Welfare Officers." *Id.*

Plaintiff also responded to USCIS' Notice of Intent to Deny with a form titled, "Status of Chief Magistrate Court Nnewi." CAR at 110. It is from an Assistant Chief Registrar I on July 7, 2023. *See id.* The form states that the family court handles adoption matters and it has three assessors assigned to the Chief Magistrate who are Social Welfare Officers. *See id.* The Government notes that the document's header contains a typo as it reads, "Government of Anambra State onf [sic] Nigeria the Judiciary." Dkt. No. 19-1 at 12.

USCIS denied Plaintiff's I-600 petition on January 8, 2024. *See* CAR at 1. In its summary of the case, USCIS did not mention the favorable I-604 determination the Consulate erroneously emailed to Plaintiff on January 25, 2023. *See* Dkt. No. 19-1 at 12. USCIS concluded that Plaintiff did not provide sufficient evidence of I.D.A.'s abandonment or that the adoption was completed in accordance with Nigerian law. *See id.*

Specifically, in response to Mrs. Nkechi's "Affidavit of Facts," USCIS stated that it "has been submitted in other Anambra State Form I-600 Petitions. The U.S. Consulate has specifically

rejected M[r]s. Nkechi's denials concerning her statements about the creation of post-adoption documents without reference to adoption files left with the Magistrate Court in Nnewi." CAR at 5. USCIS also noted that Plaintiff's filing "fails to address why your adoption application letter to the Ministry dated February 10, 2019, states your [wife's] incorrect age if the letter was written by you." *Id.* USCIS then found "a preponderance of the evidence shows the Magistrate Court in Nnewi was not properly constituted during your adoption because it did not include two assessors as required under applicable Anambra State law." CAR at 106. USCIS reviewed the Magistrate Court Orders and noted that they do not include the names of any assessors as respondents. *See id.* It also explained that Mrs. Nkechi is listed as a respondent in one Order; however, she is not named as one of the assessors in Plaintiff's 2023 supplemental letter from the Registrar. *See id.* USCIS stated that its "experience from other states in Nigeria informs that assessors' individual names are included as respondents on the face of those states' adoption orders given assessors are a threshold legal requirement." *Id.*

Plaintiff brought the present action following USCIS' denial of his Form I-600.

## III. DISCUSSION

**A.    Legal Standards**

### 1. Summary Judgment Standard

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). However, irrelevant or unnecessary factual disputes do not preclude summary judgment. *See Anderson*, 477 U.S. at 248.  Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment. *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim." *Doane*, 369 F. Supp. 3d at 438.  If the moving party establishes a prima facie basis for summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who must then "show, through affidavits or otherwise, that there is a material issue of fact for trial" that a reasonable jury could resolve in its favor.  *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635. Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute between the parties[,] will not defeat an otherwise properly supported motion for summary judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations").  The nonmoving party must show by more than a "scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*,

996 F.2d at 1461.  In determining the existence of any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90, 94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see also Jeffreys*, 426 F.3d at 553.

### 2. APA Standards

"Under the APA, a 'person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof.'" *Rosati v. Mayorkas*, 691 F. Supp. 3d 597, 601 (N.D.N.Y. 2023) (quoting *Hadwan v. United States Dep't of State*, 2021 WL 4037714, *3 (S.D.N.Y. Sept. 3, 2021)); *see also* 5 U.S.C. § 702(2)(A)). "Specifically, the APA authorizes a district court to 'hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting *Almakalani v. McAleenan*, 527 F. Supp. 3d 205, 219 (E.D.N.Y. 2021)).  "'An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Kakar v. United States Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (quoting *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020)) (additional quotation omitted).

"'When a party challenges agency action under the APA, the district court acts as an "appellate tribunal" and the case on review presents "a question of law."'" *Rosati*, 691 F. Supp. 3d at 602 (quoting *Saleh v. Blinken*, 596 F. Supp. 3d 405, 413 (E.D.N.Y. 2022)).  "Summary

judgment is generally an appropriate procedural vehicle to resolve such a case, but the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply." *Id.* (quotation and quotation marks omitted). "Instead, pursuant to the 'record rule,' the district court decides the legal issue of whether the agency's action was arbitrary and capricious by reviewing the administrative record compiled by the agency when it made its decision." *Id.* (quotation omitted) (citing *Ali v. Pompeo*, No. 16-CV-3691, 2018 WL 2058152, *4 (E.D.N.Y. May 2, 2018)). "The scope of review under the arbitrary and capricious standard is narrow and 'courts should not substitute their judgment for that of the agency.'" *Id.* (quoting *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007)) (additional citation omitted). "[I]n justifying its decision the agency need not 'provide written findings about every piece of evidence that it consider[s].'" *Kakar*, 29 F.4th at 132 (quoting *Dibble v. Fenimore*, 545 F.3d 208, 219 (2d Cir. 2008)). "A court can thus 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quotations omitted).

## B. Consular Nonreviewability Doctrine

"'For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Dep't of State v. Munoz*, 602 U.S. 899, 907 (2024) (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018)) (additional quotation marks omitted). "Congress may delegate to executive officials the discretionary authority to admit noncitizens 'immune from judicial inquiry or interference.' . . . When it does so, the action of an executive officer 'to admit or to exclude an alien' 'is final and conclusive.'" *Id.* at 907-08 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-591 (1952); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)). "The Judicial Branch has no role to play 'unless

expressly authorized by law.' . . .  The . . . INA[] does not authorize judicial review of a consular

officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions.  This

principle is known as the doctrine of consular nonreviewability."  *Id.* (quotation and footnote

omitted); *see also Xian Yong Zeng v. Pompeo*, 740 Fed. Appx. 9, 10 (2d Cir. 2018) ("The doctrine

of consular nonreviewability generally bars courts from reviewing a consular officer's denial of a

visa") (citing *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009)).

The Government asks this Court to dismiss Plaintiff's complaint under the doctrine of

consular nonreviewability because Plaintiff challenges a step of the visa-issuing process.  *See* Dkt.

No. 19 at 21-26.  The Government argues that courts have applied the doctrine outside of the

ultimate consular visa determination, including cases challenging a delay in processing under the

APA.  *See id.* at 22-24.

Plaintiff contends that he is not seeking the Court's review of a consular officer's denial of

a visa; rather, "[t]he decision under review is USCIS's decision to deny [Plaintiff's] orphan

petition, which is a process that precedes a visa application presented to a consular officer for

issuance or a denial of a visa."  Dkt. No. 20 at 9.  Plaintiff explains that "[i]mmigration laws

unambiguously provide USCIS with the ultimate, exclusive authority to decide the petition and

the consular officer has the authority to issue or refuse the visa based on an approved petition."

*Id.* at 11 (citing 8 U.S.C. §§ 1154(b), 1201).

"Courts have stated that it 'is settled that the judiciary will not interfere with the visa-

issuing process."  *Khan v. United States Dep't of State*, 722 F. Supp. 3d 92, 97 (D. Conn. 2024)

(quoting *Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978)).  "'[T]he doctrine also applies where

a plaintiff attempts to circumvent the doctrine by claiming that he is not seeking a review of the

consular officer's decision, but is challenging some other, related aspect of the decision.'"  *Nine*

*Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) (quoting *Malyutin v. Rice*, 677 F. Supp.2 d 43, 46 (D.D.C. 2009)).  "However, courts have also clarified that the doctrine applies to review of 'a consular official's decision to issue or withhold a visa,' not to the decisions of non-consular officials and certainly not to [the Department of Homeland Security]."  *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 418 (S.D.N.Y. 2006) (citing *Abourezk v. Reagan,* 785 F.2d 1043, 1050-51 n.6 (D.C. Cir. 1986); *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988)).

The Government is correct that "'[c]ourts in this Circuit have applied the doctrine of consular nonreviewability to unreasonable delay claims under the APA and unreasonable delay claims under the Mandamus Act.'"  *Tharmabalan v. Blinken*, 732 F. Supp. 3d 269, 276 (S.D.N.Y. 2024) (quoting *Nawaz v. United States Dep't of State*, No. 22-CV-5343, 2024 WL 99486, *4 (E.D.N.Y. Jan. 9, 2024)); *see also Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 11-12 (D.D.C. 2022) ("[S]everal district court decisions within the Second Circuit have held that the consular nonreviewability doctrine bars suits to compel action on a delayed visa application"); Dkt. No. 19 at 24.  "These decisions ground their conclusion in a broad declaration by the Second Circuit that 'the judiciary will not interfere with the visa-issuing *process*.'"  *Al-Gharawy*, 617 F. Supp. 3d at 12 (quoting *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978)).

However, as Plaintiff explains, there is a statutory distinction between the procedure for petitioning "the Attorney General" to classify an alien as "an immediate relative status under section 1151(b)(2)(A)(i)" and applying for "an immigrant visa" from "a consular officer."  8 U.S.C. §§ 1154(a)(1)(A)(i), 1201(a)(1); *see also* Dkt. No. 20 at 11.

Few courts have discussed whether the doctrine of consular nonreviewability applies to an APA claim challenging a USCIS decision to deny a petition.  Those that have, conclude that the

doctrine does not bar the judiciary's consideration of the claim.  *See Maramjaya v. U.S.*

*Citizenship & Immigr. Servs.*, No. 06-CV-2158, 2008 WL 9398947, *4 (D.D.C. Mar. 26, 2008)

("[The p]laintiff does not challenge the visa decision of any consular official.  Instead, Mr.

Maramjaya contends that USCIS violated the APA by improperly denying a Form I–140

immigrant petition for alien worker, the granting of which is a prerequisite to, but not a guarantee

of, an alien employee receiving an immigrant visa.  In fact, Form I–140 approval occurs before

the Department of State becomes involved in the immigration process.  Thus, this case has not

procedurally progressed to the point where consular immunity would bar judicial review, and the

doctrine of consular nonreviewability does not apply to the instant scenario"); *Atanackovic v.*

*Duke*, 399 F. Supp. 3d 79, 88 (W.D.N.Y. 2019) ("The statute distinguishes between the absolute

discretion of consular officers and the legal authority of [Custom and Border Patrol ("CBP")]

officers.  Dr. Atanackovic is not attempting to challenge a consular denial.  He is strictly

challenging CBP's decision at the border.  The doctrine of consular nonreviewability does not

apply"); *Coniglio v. Garland*, 556 F. Supp. 3d 187, 201 (E.D.N.Y. 2021) ("[T]he Court holds that

USCIS's decision to approve and forward a petition is legally distinct from a consulate's decision

to vise a passport, and that the Doctrine of Consular Nonreviewability shields only the latter

decision from judicial review").

    These courts have recognized that "[t]he two processes—USCIS petition approval and

consular visa issuance—are authorized by different statutory subsections and accomplished by

personnel attached to distinct agencies that are not even housed in the same Executive

department."  *Conglio*, 556 F. Supp. 3d at 201 (citing 8 U.S.C. §§ 1154, 1201); *see also Zemeka*

*v. Holder*, 989 F. Supp. 2d 122, 127 (D.D.C. 2013) ("The Court has jurisdiction to review a final

agency decision denying an I-130 petition on the basis of marriage fraud under the Administrative Procedure Act").

Also demonstrative of the Court's ability to review Plaintiff's claims are those cases that have analyzed the merits of an APA claim concerning a USCIS petition denial which have not discussed the doctrine of consular nonreviewability.  In the Government's motion in this case, it relies on cases to rebut the merits of Plaintiff's claims, and in those cases, the federal court clearly exercised jurisdiction to review USCIS's decision to deny a petition.  *See* Dkt. No. 19 at 16, 32 (citing *Nwankwere*, 2023 WL 5835785, at *2; *Almakalani v. McAleenan*, 527 F. Supp. 3d 205, 220 (E.D.N.Y. 2021)).  Numerous other courts have likewise exercised jurisdiction to review an APA claim concerning a USCIS petition decision, including this Court.  *See Muozoba v. Jaddou*, No. 1:23-CV-1112, 2024 WL 3968900, *7 (N.D.N.Y. Aug. 28, 2024); *Blanford v. United States Citizenship & Immigrantion Servs.*, No. 1:23-CV-322, 2024 WL 4940251, *6 (N.D. Ind. May 10, 2024); *Robinson v. Napolitano*, 554 F.3d 358, 360 (3d Cir. 2009); *Gatithi v. Bd. of Immigr. Appeals*, 412 F. Supp. 3d 1075, 1079 (E.D. Mo. 2019); *Iyawe v. Garland*, 28 F.4th 875, 878 (8th Cir. 2022); *Risoli v. Nielsen*, 734 Fed. Appx. 61, 62 (2d Cir. 2018).

Here, the Government argues that "[t]he Court should dismiss both claims under the doctrine of consular reviewability [because] judicial review of USCIS's decision to deny the Form I-600 petition would interfere with the visa-issuing process."  Dkt. No. 19 at 20.  The Government does not contend that Plaintiff challenges any decision by a consular officer.  The Government acknowledges that "USCIS made a final decision due to articulable concerns that could only be resolved through the I-604 determination."  *Id.* at 18.

The Government cites numerous cases to "illustrate that the doctrine precludes or limits review to challenges of various types of denials by USCIS and . . . CBP that are directly related to

the denial of a visa application." Dkt. No. 19 at 22. The cases cited by the Government are inapposite. First, the Government cites two cases which specifically concern a decision about a visa application. *See id.* at 21-22 (citing *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017); *Thatikonda v. DHS*, No. 21-CV-1564, 2022 WL 425013, *6-7 (D.D.C. Feb. 11, 2022); *Al Makaaseb Gen. Trading Co. v. Christopher*, No. 94-cv-1179, 1995 WL 110117, *3 (S.D.N.Y. Mar. 13, 1995)). As explained, Plaintiff's case does not concern a visa, but the orphan petition. Second, the Government's reliance on *Al Saidi v. U.S. Embassy in Djibouti*, 544 F. Supp. 3d 289, 299 (E.D.N.Y. 2021), which concerns a visa *petition* is not instructive because the plaintiff's challenge was to "the determination made at the *consulate*." Dkt. No. 19 at 22. Here, Plaintiff does not challenge a consular officer's decision, or a decision made at the consulate; rather, he challenges USCIS's decision.

Based on the foregoing, the Court concludes that Plaintiff's claims are not barred by the doctrine of consular nonreviewability because he does not challenge a discretionary decision made by a consular officer or a delay in the processing of a visa application. Because Plaintiff brings his claims against USCIS, attacking its decision to deny his orphan petition, the authority for which is statutorily distinct from a consular officer's decision, the Court will proceed to review the merits of Plaintiff's APA claims.

## C.    Merits of Allegations

"'Under the APA, we may set aside an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Muozoba*, 2024 WL 3968900, at *5 (quoting *Kakar*, 29 F.4th at 132). "'An agency's decision is arbitrary and capricious only if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Am. Cruise Lines*, 96 F.4th at 286) (additional quotation marks omitted).

Plaintiff argues that "USCIS arbitrarily and capriciously rejected the findings, judgment, and validity of adoption order issued by the Nigerian Magistrate Court" by substituting its own opinion regarding the use and existence of assessors in the adoption process. Dkt. No. 12-1 at 15-16. Plaintiff also asserts that "USCIS impermissibly attacked the findings of the Magistrate Judge regarding the identity and orphan status of I.D.A. in violation of law and USCIS policy." *Id.* at 17. He argues that "USCIS had no rational basis to substitute its own judgment for that of the Magistrate Court" concerning the conclusion that I.D.A. was abandoned. *Id.* at 18. Finally, Plaintiff contends that USCIS relied on speculation and suspicions unsupported by substantial evidence to reject the documentation submitted with his application. *See id.* at 19-20.

The Government disagrees. *See* Dkt. No. 19. The Government argues USCIS's decision was not arbitrary and capricious because Plaintiff failed to establish that I.D.A. was abandoned and that Plaintiff adopted I.D.A. in accordance with Nigerian law. *See id.* at 26-31. The Government contends that USCIS appropriately considered all of the evidence in the record and provided sufficient justification for rejecting Plaintiff's I-600 petition. *See id.* at 31-34.

As an initial matter, Plaintiff references the substantial evidence standard. *See* Dkt. No. 12-1 at 19-20. The Government does not discuss the substantial evidence standard. *See* Dkt. No. 19. The substantial evidence "standard [] is 'more searching' than the 'arbitrary and capricious' standard." *Kakar*, 29 F.4th at 135 (quoting *United States v. Int'l Bhd. of Teamsters*, 964 F.2d 1308, 1311-12 (2d Cir. 1992)).

"[W]hich standard is applicable is a function of the procedures provided by the statutes governing the agency's actions." *Simko v. Bd. of Immigr. Appeals*, 156 F. Supp. 3d 300, 307 (D. Conn. 2015) (citing 5 U.S.C. §§ 706(2)(E), 554(a)).  Section 554 states that it "applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing."  5 U.S.C. § 554(a).  Section 706 states that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The statute notes that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute[.]" *Id.* § 706(2)(A), (E).

"Section 1154 [of the INA] provides that, '[a]fter an investigation of the facts in each case' in which an I-130 Petition is submitted, 'the Attorney General shall, if he determines that the facts stated in the petition are true . . . approve the petition and forward one copy thereof to the Department of State.'" *Id.* (quoting 8 U.S.C. § 1154(b)).  "Section 1154 does not provide for a hearing on the record or for any other kind of formal procedure; 'an investigation of the facts in each case' by the Attorney General is all that is guaranteed to applicants." *Id.* (quotation and citations omitted).  Therefore, courts have concluded that "because section 1154 does not provide a hearing right to persons seeking approval of I-130 Petitions . . ., the substantial evidence standard of section 706(2)(E) is not the appropriate standard of review . . . ." *Id.*; *see also Ru Jun*

*Zhang v. Lynch*, No. 16-CV-4889, 2018 WL 1157756, *6 (E.D.N.Y. Mar. 1, 2018), *aff'd sub nom.*
*Ru Jun Zhang v. Barr*, 756 Fed. Appx. 107 (2d Cir. 2019)

The same is true in this case. USCIS denied Plaintiff's I-600 petition pursuant to § 1154 and the record does not contain evidence of a formal evidentiary hearing on Plaintiff's petition. *See* CAR at 1-6. Accordingly, the Court will review USCIS's decision under the arbitrary and capricious standard.[7] *See ScotlandShop USA, Inc. v. US Citizenship & Immigr. Servs.*, No. 1:23-CV-0703, 2024 WL 5137558, *8 (N.D.N.Y. Dec. 17, 2024) (applying the arbitrary and capricious standard to a USCIS standard); *Miezgiel v. Holder*, 33 F. Supp. 3d 184, 192 (E.D.N.Y. 2014) (same); *Think Food Grp. v. Jaddou*, No. 2:23-CV-482, 2025 WL 289322, *9 (D. Vt. Jan. 10, 2025) (same).

For the following reasons, and under the highly deferential standard of review, the Court concludes that USCIS's decision was not arbitrary and capricious. "[I]t was fully within USCIS' authority to consider and reconcile conflicting evidence in a reasonable manner." *Muozoba*, 2024 WL 3968900, at *7. The Court cannot reweigh USCIS' reconciliation of that evidence. *See id.*; *see also Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) ("The Court's task is not to engage in an independent evaluation of the cold record, nor to substitute its judgment for

---

[7] "[T]he difference between the arbitrary and capricious and substantial evidence standards in this context is slight, if a meaningful difference exists at all." *Simko*, 156 F. Supp. 3d at 308 (citation omitted). "It is perhaps for this reason that the Second Circuit has applied both the arbitrary and capricious test and the substantial evidence test to review of an agency's denial of an I-130 Petition without appearing to engage with the question of which standard of review is appropriate." *Id.* (citing *Berrios v. Holder*, 502 Fed. Appx. 100, 101 (2d Cir. 2012); *Koffi v. Holder*, 487 Fed. Appx. 658, 660 (2d Cir. 2012)); *but see Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1214 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) (acknowledging in the context of the Environmental Protection Agency, "Congress put the substantial evidence test in the statute because it wanted the courts to scrutinize the Commission's actions more closely than an 'arbitrary and capricious' standard would allow").

that of the agency") (quoting *Guan v. Gonzales*, 432 F.3d 391, 394-95 (2d Cir. 2005); *Natural Res. Def. Council v. U.S. EPA*, 658 F.3d 200, 215 (2d Cir. 2011)) (quotation marks omitted).

Immigration regulations require Plaintiff to prove that I.D.A. is an "orphan" and that the Nigerian adoption complied with Nigerian law.  *See* 8 C.F.R. § 204.3(d)(1)(iii)(C), (h)(12) (explaining that "[a]n orphan petition must be accompanied by full documentation as follows: . . . "Evidence that the child is an orphan as appropriate to the case: (A) [e]vidence that the orphan has been abandoned or deserted by, separated or lost from both parents, or that both parents have disappeared as those terms are defined in paragraph (b) of this section" and "[e]vidence of adoption abroad or that the prospective adoptive parents have, or a person or entity working on their behalf has, custody of the orphan for emigration and adoption in accordance with the laws of the foreign-sending country").

USCIS concluded that Plaintiff failed to meet his burden on both issues because Plaintiff did not present any "credible evidence of a search being conducted for [I.D.A.'s] birth parents" and there was insufficient credible evidence demonstrating that the Nigerian adoption was performed in accordance with Anambra State law.  CAR at 5-6.

Plaintiff argues that USCIS speculated about the documents and circumstances underlying the adoption and that Plaintiff did establish I.D.A.'s abandonment and followed proper Anambra State law.  The Court disagrees.  First, Plaintiff states that "[t]he government acknowledges the evidence from the Ministry and Orphanage reflect that I.D.A. was unconditionally given to the orphanage . . ., that the identity and whereabouts of the natural parents are unknown . . ., and a reasonable effort was made to find them."  Dkt. No. 20 at 12.  It is true that USCIS acknowledged that I.D.A.'s birth parents' whereabouts are unknown.  *See* CAR at 1-6; *see also* Dkt. No. 19 at 29. However, the Government does not concede that I.D.A. was "unconditionally given to the

28

orphanage" or that "reasonable efforts [were] made to find them."  Dkt. No. 20 at 12.  Rather, USCIS appropriately concluded, and the Government reiterates in its response, that there is no credible evidence that a reasonable search for I.D.A.'s birth parents was conducted.  *See* CAR at 5-6; *see also* Dkt. No. 19 at 29.

Neither 8 C.F.R. § 204.3(b) nor USCIS's Policy Manual define "reasonable efforts" in trying to locate birth parents.  However, as explained by USCIS, the evidence in the record demonstrates that I.D.A. was found outside of the orphanage on July 23, 2020, "in the early hours of the day."  CAR at 4-5, 142.  Mrs. Udokwu, the orphanage's matron, submitted an affidavit the same day stating that "social inquiries are being conducted to find the parent or birth mother of the child."  CAR at 142.  Later that day, at 4:10 PM, the police report indicated "[t]hat a search was conducted to find the person(s) who might have left the child there, but all effort proved abortive."  CAR at 141.

USCIS's conclusion that this evidence does not demonstrate reasonable efforts to locate the birth parents is not arbitrary and capricious because there is no evidence that a search was conducted for more than a few hours, nor are there any specifics provided as to the purported search.  *See 26616380 Appeal of National Benefits Center Decision Form I-600, Petition To Classify Orphan As An Immediate Relative*, 2023 WL 4998963, *7 (concluding that an applicant had not established a child was an orphan despite speaking with the birth mother and the intake report being created more than a year after the child's birth because there were unresolved inconsistencies in the evidence); *Muozoba*, 2024 WL 3968900, at *7 ("USCIS appropriately relied upon these inconsistencies in the evidence in finding that Plaintiff had not met her burden to substantiate identity and/or orphanhood by a preponderance of the evidence, noting also that Plaintiff had not submitted any information regarding in which local maternity the relevant child

had been born or any evidence that either the orphanage or the ministry verified the birth mother's story").

Plaintiff argues that "[t]here is no requirement to identify the natural parents of an orphan . . . . Evidence of a successful search for the birth parents was not necessary to show I.D.A. was an orphan by reason of abandonment and desertion and any alleged lack of detail in the documents relating to the search do not support the speculative finding that the abandonment of I.D.A. was false or fabricated." Dkt. No. 12-1 at 20 (citing 8 C.F.R. § 204.3(b)).

Adoption and desertion require evidence that a child "has been given unconditionally to an orphanage" and that "both parents . . . have willfully forsaken their child." 8 C.F.R. § 204.3(b). There is no evidence in the record that both of I.D.A.'s parents "gave" I.D.A. to the orphanage or that they did anything "willfully." *Id.* There is no evidence demonstrating how I.D.A. arrived at the orphanage or that there were any efforts to determine that information besides some "social inquires" being made over a few hours. CAR at 142. Plaintiff has also failed to explain why his wife's birthday was incorrect on the adoption application. *See* Dkt. Nos. 12, 20. He did not present evidence to USCIS explaining the error and he has not provided any explanation to this Court. *See* Dkt. Nos. 12, 20; *see also* CAR at 4. Plaintiff argues that the error "is immaterial and thus insufficient to show Mr. Anameze acted to deliberately deceive USCIS to grant the visa petition for his adopted child." Dkt. No. 12-1 at 20.[8]

USCIS is entitled to consider the reliability of evidence which includes a "[l]ack of parental consent to the adoption; [n]o or improper notice of termination of parental rights;

---

[8] The Court notes that Mrs. Nkechi noted in her 2023 statement that Plaintiff and his wife "sent in their application through their relative." CAR at 107. However, in Plaintiff's statement of material facts, Plaintiff states that he "and his wife submitted" the application and it was Plaintiff who "incorrectly listed his spouse's age on the application." Dkt. No. 19-1 at 1-2.

[e]vidence of corruption, fraud, or material misrepresentation; . . . [and o]ther credible and

probative evidence to question the reliability of the documentation."  USCIS Policy Manual Vol.

5, Part C, Ch. 8(C)(1).  Here, there was no evidence that I.D.A.'s birth parents consented to the

adoption or were notified of the adoption because the only evidence indicating that the birth

parents were searched for is an affidavit showing that, at most, "social inquiries" were made over

a few hours.  CAR at 142.  USCIS was entitled to consider this information as well as the

incorrect birthdate written on the adoption application to find that there were indicia of fraud.  *Cf.*

*Blanford v. United States Citizenship & Immigrantion Servs.*, No. 1:23-CV-322, 2024 WL

4940251, *6 (N.D. Ind. May 10, 2024) (concluding that there was "no direct evidence of child -

buying.  There are no admissions of child-buying.  All documents related to the payments show

that they were for travel expenses. . . . [The mother] affirmed under oath that '[d]ue to her

destitution coupled with mental anguish,' she 'was no longer in the position to provide life

necessities for the support and care of her children'").

    USCIS' conclusion that the adoption was not conducted pursuant to Anambra State law is

also supported by the record.  As USCIS explained, there is no evidence that two assessors were

present for I.D.A.'s adoption.  The Chief Magistrate's Order contains the Chief Magistrate's name,

the name of an Assistant Chief Registrar, Plaintiff and his wife's names, and the "Respondents,"

"Ministry of Women Affairs and Social Development, Awka (Child Development Department)."

CAR at 154.  USCIS correctly noted that the Order does not contain the names of any assessors.

*See* CAR at 6.

    Plaintiff relies on Mrs. Nkechi's declarations, arguing that her "rebuttal and clarification of

her own testimony in the December 2019 interview did not afford USCIS license to speculate that

I.D.A.'s abandonment and identity were false and fabricated."  Dkt. No. 12-1 at 19.

However, as explained by USCIS, Mrs. Nkechi's 2020 affidavit has been submitted in other cases. *See* CAR at 5. It was not drafted to specifically address I.D.A.'s adoption. *See* CAR at 100-01. The Court also agrees that the names of the three assessors provided by the Assistant Chief Registrar, *see* CAR at 110, are not listed on the Chief Magistrate's adoption orders. *See* CAR at 152-54. Although Mrs. Nkechi stated in 2023 that "assessors are always present in the family court hearings including adoption matters," CAR at 108, USCIS is tasked with reconciling conflicting evidence. *Muozoba*, 2024 WL 3968900, at *7. There were no assessors named included on the adoption Order. *See* CAR at 152-54.

To the extent Plaintiff takes issue with USCIS' reliance on its "experience from other states in Nigeria," Dkt. No. 12-1 at 16 (quoting CAR at 6), the agency is instructed to consider "[o]ther credible and probative evidence to question the reliability of the documentation." USCIS Policy Manual Vol. 5, Part C, Ch. 8. Plaintiff does not challenge the credibility of USCIS' statement that in "other states in Nigeria[,] . . . assessors' individual names are included as respondents on the face of those states' adoption orders." CAR at 6. USCIS also did not rely solely on its knowledge of adoption orders in "other states" in ruling on Plaintiff's petition. *Nwankwere*, 2023 WL 5835785, at *9 (denying the plaintiff's motion for summary judgment and noting that "the USCIS's decision makes clear that the agency did not rely only on Nigeria's general country conditions, but instead considered the evidence specific to D.A.C.'s fostering and adoption").

Based on the foregoing, USCIS' conclusion that the adoption was not conducted in accordance with Anambra State law requiring the presence of two assessors is not arbitrary and

capricious.[9]  USCIS did not "'rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, [n]or [make a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Muozoba*, 2024 WL 3968900, at *5 (quotation omitted).

The Court will note that adopting a child is one of the most selfless acts a person can undertake.  The Court recognizes the weight of this case and the impact this decision may have on Plaintiff, his wife, and I.D.A.  However, because the Court cannot reweigh the evidence and USCIS' conclusions are not arbitrary and capricious, the Court will not set aside USCIS' decision denying Plaintiff's I-600 petition.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 12) is **DENIED**; and the Court further

---

[9] The Government notes that the Assistant Chief Registrar's "statement is drafted on letterhead that misspells the name of the entity it appears created the document, . . . which is a clear indication that the document is fraudulent." Dkt. No. 19 at 31.  Plaintiff calls this argument "ridiculous." Dkt. No. 20-1 at 3.  There does appear to be a typographical error in the header of the Assistant Chief Registrar's document.  *See* CAR at 110.  The header states, "Government of Anambra State onf [sic] Nigeria." *Id.*  A misspelling in the name of a court does raise concerns about reliability and authenticity.  However, USCIS did not raise this issue in its decision.  *See* CAR at 1-6.  It is well settled that "'[c]ounsel's *post hoc* rationalizations for agency action' are not a valid basis to uphold such action." *New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 540 (S.D.N.Y. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).  Accordingly, the Court did not consider the misspelling when deciding whether USCIS' decision is arbitrary and capricious.

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  February 10, 2025
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

34